1999 UT App 028

**HARRINGTON PROPERTIES, INC., a Utah corporation; Robert L. Harrington; and Jane R. Harrington, Plaintiffs and Appellees,**

v.

**Marilyn Hamilton PETERSON; and Global Motors Inns, a Utah corporation, Defendants and Appellants.**

No. 971717–CA.

Court of Appeals of Utah.

Feb. 4, 1999.

Harold C. Verhaaren, John K. Mangum, and Scott M. Ellsworth, Salt Lake City, for Appellants.

James S. Jardine, Brent D. Wride, and Eric D. Barton, Salt Lake City, for Appellees.

Before Judges BENCH, BILLINGS, and ORME.

## OPINION [1]

BILLINGS, Judge:

¶ 1 This matter is before the court on both parties' Petitions for Rehearing, filed subsequent to issuance of our opinion in this case. *See Harrington Properties, Inc. v. Peterson,* 357 Utah Adv. Rep. 21 (Utah Ct.App.1998). Appellant Marilyn Peterson (Peterson) appealed an order granting summary judgment to appellee Harrington Properties, Inc. (Harrington) in a dispute arising from Harrington's construction of a home on a residential lot (the Property) originally owned by Peterson. We reversed and remanded the case to the trial court, concluding the trial court erred in interpreting written agreements between the parties. After considering both parties' Petitions for Rehearing, the court withdrew its earlier opinion. This opinion replaces it.

## FACTS

¶ 2 In 1991, Harrington bought the Property from Peterson by executing a promissory note for $95,000 payable to Peterson (the Peterson Note). The Peterson Note was to be paid in a single installment on March 21, 1992, nine months after the closing. Contrary to the terms of the underlying earnest money agreement, the Peterson Note as signed at closing, while Peterson was out of state, made no provision for predefault interest.

---

1. This opinion on rehearing replaces the opinion in Case No. 971717–CA issued on November 27, 1998.

¶3 The parties agreed that Harrington would build a luxury home on the Property and then sell it. To this end, Peterson agreed to subordinate her purchase money loan to a construction loan from Guardian Bank, which was initiated concurrently with the sale of the Property and secured by a first-position trust deed (the Guardian Bank Trust Deed) on the Property.

¶4 Payment of the Peterson Note was secured by a second position trust deed on the Property (Peterson Trust Deed). The Peterson Trust Deed stated that the conveyance of the Property into trust was for the purpose of securing:

(1) payment of the indebtedness evidenced by a promissory note of even date hereof in the principal sum of $95,000, made by Trustor [Harrington], payable to the order of Beneficiary [Peterson] at the time, in the manner and with interest as therein set forth, and any extensions and/or renewals or modifications thereof; (2) *the performance of each agreement of Trustor herein contained;* (3) the payment of such additional loans or advances as hereafter may be made to Trustor, or his successors or assigns, when evidenced by a promissory note or notes reciting that they are secured by this Deed of Trust; and (4) *the payment of all sums expended or advanced by Beneficiary under or pursuant to the terms hereof, together with interest thereon as herein provided.*

(Emphasis added.)

¶5 Harrington's obligations under the Peterson Trust Deed included:

1. To keep said property in good condition and repair; not to remove or demolish any building thereon; *to complete or restore promptly and in good and workmanlike manner any building which may be constructed,* damaged or destroyed thereon; to comply with all laws, covenants and restrictions affecting said property; not to commit or permit waste thereof; not to commit, suffer or permit any act upon said property in violation of law; to do all other acts which from the character or use of said property may be reasonably necessary, the specific enumerations herein not excluding the general; *and, if the loan secured hereby or any part hereof is being obtained for the purpose of financing construction of improvements on said property Trustor further agrees:*

(a) To commence construction and to pursue same with reasonable diligence to completion in accordance with plans and specifications satisfactory to Beneficiary.

(b) To allow Beneficiary to inspect said property at all times during construction.

. . . .

8. To pay immediately and without demand all sums expended hereunder by Beneficiary ... and the repayment thereof shall be secured hereby.

(Emphasis added.)

¶6 Furthermore, the Peterson Trust Deed stated under paragraph seven that

[s]hould Trustor fail to make any payment or to do any act as herein provided, then Beneficiary ... without obligation so to do and without notice to or demand upon Trustor and without releasing Trustor from any obligation hereof, may: Make or do the same in such manner and to such extent as [Beneficiary] may deem necessary to protect the security hereof .... [a]nd in exercising any such powers, incur any liability, expend whatever amounts in its absolute discretion it may deem necessary therefor....

¶7 Construction on the Property did not progress as planned. When the Peterson Note became due in March 1992, Harrington informed Peterson that actual construction costs had run over the estimates, that the course of construction had met with substantial delays, and that he would be unable to repay the purchase money loan on time.

¶8 In June 1992, Harrington filed for bankruptcy. In September 1992, Harrington told Peterson that because of delays and additional costs, construction on the Property could not go forward without additional funds.

¶9 On December 8, 1992, Peterson entered into an agreement to advance Harrington up to $75,000 to complete construction, and to

preserve her security interest in the Property by ensuring the Property could be sold as a finished house. The December 8 agreement also contained a clause revising the due date of the original $95,000 Peterson Note, making repayment of the original Peterson Note and the December 1992, $75,000 advance due on sale of the Property.

¶ 10 Beginning in March 1993, and continuing through November 1993, Peterson, at Harrington's request, made a series of advances to Harrington to ensure construction could be completed. These advances were not evidenced by a promissory note but were described in a letter sent to Peterson. These advances totaled the sum of $70,076.44.[2]

¶ 11 On February 24, 1994, the Property sold for $472,500. This price was insufficient to cover all the debts owed on the Property as a result of the construction of the house. To avoid foreclosure and allow the sale to proceed, Peterson acquired Guardian Bank's interest in its construction loan, and Harrington and Peterson entered into a new agreement that authorized the sale of the Property but preserved their claims and defenses against each other. This lawsuit resulted.

¶ 12 The parties filed cross-motions for summary judgment to resolve the matters in dispute between them. Peterson argued that her 1993 incremental advances of construction funds were secured by the Peterson Trust Deed, and that she was owed default interest on the original $95,000 Peterson Note at the statutory rate of ten percent per annum from March 1992 forward.

¶ 13 The trial court granted summary judgment in favor of Harrington. First, the trial court concluded the parties had not complied with the language necessary to secure $65,177.63 of the 1993 incremental advances. The court held that since the loans were not "evidenced by a promissory note . . . reciting that [it was] secured by the Deed of Trust," the Peterson Trust Deed did not secure them. Second, the trial court concluded that Peterson was not entitled to default interest on the original Peterson

Note because the parties had revised the original March 21, 1992 due date in the 1992 Agreement to the date the property was sold, and therefore Harrington had not defaulted and no interest was due. Peterson appeals both trial court determinations, urging us to reverse the summary judgment for Harrington and grant summary judgment in her favor.

## ANALYSIS

¶ 14 This case presents two issues. First, were the 1993 incremental advances secured by the Property under the original Peterson Trust Deed? Second, what default interest, if any, is due on the original Peterson Note? We resolve both issues relying on the undisputed facts and on the terms of the parties' written contracts, and thus review the trial court's legal determinations for correctness. *See Saunders v. Sharp*, 806 P.2d 198, 200 (Utah 1991) ("The interpretation of a contract is a matter of law for the court to determine unless the contract is ambiguous and evidence of the parties' intent . . . is necessary to establish the terms of the contract.").

I. Were the 1993 advances secured by the Peterson Trust Deed?

¶ 15 Peterson argues the Peterson Trust Deed secured her 1993 incremental advances of construction funds. Harrington contends, however, that these 1993 advances represent "additional loans" under the terms of the Trust Deed, and that those advances are thus not secured by the Property because they are not "evidenced by a promissory note . . . reciting that [it is] secured by this Deed of Trust." We disagree with Harrington's reading of the Peterson Trust Deed as it negates important promises he made. We conclude the 1993 advances were not made pursuant to paragraph three as additional loans but rather advances made to insure performance of obligations that Harrington had failed to perform under para-

2. Of the $70,076.44 in advances, the trial court previously ordered that $4,898.81 (paid by Peterson directly to Guardian State Bank in two installments in April and early June 1993 to cure delinquencies with Guardian) was secured under the Trust Deed. Thus, we note the total of the 1993 advances that the decision of the trial court left unsecured was $65,177.63.

graph two of the original Peterson Trust Deed.

¶ 16 The Peterson Trust Deed states that it is intended to secure:

(2) *the performance of each agreement of Trustor herein contained;*

. . . .

(4) *the payment of all sums expended or advanced by Beneficiary under or pursuant to the terms hereof, together with interest thereon as herein provided.*

(Emphasis added.)

¶ 17 Harrington's promises made in the Peterson Trust Deed included:

1. To keep said property in good condition and repair; not to remove or demolish any building thereon; *to complete or restore promptly and in good workmanlike manner any building which may be constructed,* damaged or destroyed thereon; to comply with all laws, covenants and restrictions affecting said property; not to commit or permit waste thereof; not to commit, suffer or permit any act upon said property in violation of law; to do all other acts which from the character or use of said property may be reasonably necessary, the specific enumerations herein not excluding the general; *and, if the loan secured hereby or any part hereof is being obtained for the purpose of financing construction of improvements on said property Trustor further agrees:*

(a) To commence construction and to pursue same with reasonable diligence to completion in accordance with plans and specifications satisfactory to Beneficiary, and

(b) To allow Beneficiary to inspect said property at all times during construction.

. . .

(Emphasis added.)

¶ 18 Thus, under clause one, Harrington promised "to complete . . . promptly and in good and workmanlike manner any building *which may be constructed* . . . thereon." Harrington purchased the Property to construct a house for resale, and in the event that Harrington failed to meet this obligation of completing construction promptly, Peterson was authorized under the Peterson Trust Deed to expend any sums that she reasonably determined were necessary to complete construction and thus protect her interest. This is what she did by her 1993 payments.

¶ 19 Harrington argues that the promises in paragraph one of the Peterson Trust Deed do not flow to Peterson because the original loan was a purchase money loan, not a construction loan. Harrington relies on the later language within paragraph one which reads: "if the loan secured hereby or any part hereof is being obtained for the purpose of financing construction of improvements on said property . . . ." We disagree with Harrington's reading of paragraph one.

¶ 20 Paragraph one makes *two* relevant and independent promises relative to construction. The first promise is not modified by the limiting phrase "if the loan secured hereby is being obtained for the purpose of financing construction or improvements . . . ." It simply states, "Trustor agrees . . . to complete . . . promptly and in good workmanlike manner any building which may be constructed." Thus, this portion of paragraph one applies to Peterson's advances since they were made to cure an obligation that Harrington failed to meet.

¶ 21 The second promise involves commitments in addition to those made in the first. Harrington was obligated to "commence construction promptly and to pursue same with reasonable diligence to completion in accordance *with plans and specifications satisfactory to Beneficiary,*" and "[t]o allow Beneficiary *to inspect said property at all times during construction.*" These commitments are not implicated under the first promise. Thus, this second promise (included in the form document and not applicable to the transaction in this case) triggered additional rights specifically limited to situations where the loan secured by the Trust Deed was to finance construction, while the first promise did not. We therefore conclude there is no incongruity in enforcing the first promise in favor of Peterson.

¶ 22 Harrington further claims the first promise to complete construction could not involve an "obligation to complete construc-

tion on a structure that did not exist when Harrington bought the land from Peterson." We disagree. Both parties understood that the loan was to enable Harrington to build a home on the Property. Furthermore, the promise in paragraph one of the Peterson Trust Deed speaks to future construction, stating "to complete ... any building ... *which may be constructed.*"

¶ 23 When Harrington failed to perform this obligation, Peterson was given specific remedies—remedies that would be secured by the Peterson Trust Deed:

> 7. Should Trustor fail to make any payment or to do any act as herein provided, then Beneficiary ... may: Make or do the same in such manner and to such extent as [Beneficiary] may deem necessary to protect the security hereof ... and in exercising any such powers [Beneficiary may] incur any liability, expend whatever amounts in its absolute discretion it may deem necessary therefor....
>
> 8. *To pay immediately and without demand all sums expended hereunder by Beneficiary ... [A]nd the repayment thereof shall be secured hereby.*

(Emphasis added.)

¶ 24 Thus, Harrington was required by the plain language of the Peterson Trust Deed "to complete ... in good workmanlike manner any building which may be constructed," and this promise under paragraph one of the Peterson Trust Deed was secured by the Property. If Harrington failed to meet this obligation, Peterson was authorized under the Peterson Trust Deed to expend any sums that she reasonably determined were necessary to protect her position. Finally, Harrington was obligated to repay, with interest, all sums expended by Peterson for this purpose, regardless of how the advances were memorialized, and the repayment of these sums was secured by the Peterson Trust Deed.

¶ 25 Peterson made the 1993 advances because Harrington had informed her that he could not complete construction on the Property. Peterson's 1993 advances to Harrington were made to complete construction in order to protect her security interest in the Property. Thus, based on the plain language

of the Peterson Trust Deed and the undisputed facts, we conclude that all of Peterson's 1993 advances of construction money were secured by the Property.

## II. Did default interest accrue on the original Peterson Note?

■ ¶ 26 Peterson also argues that default interest accrued on the original Peterson Note beginning in March 1992, the original due date of the Peterson Note. Peterson asserts that, because the Peterson Note did not specify a different rate for default interest, the default interest should be levied according to the statutory rate of ten percent. Harrington, in contrast, argues that he owes no default interest because the December 8, 1992 agreement altered the original Peterson Note's due date to the date the Property was sold. We agree with neither party. Rather, we conclude that default interest on the original Peterson Note is due from March 1992, the date of the original default, to December 8, 1992, when the due date of the Peterson Note was, by agreement, extended to the date the Property was sold.

¶ 27 The original 1991 Peterson Note provided no pre-default interest; instead, Harrington inserted an "N/A" on the appropriate blank. Nothing comparable was done in the portion of the Peterson Note that addressed interest after default. No waiver of default interest was made, and the blank for the rate of default interest was simply left unfilled. Thus, the agreement does not specify a default interest rate. In situations such as this, Utah law establishes a statutory rate under Utah Code Ann. § 15-1-1(2) (1996):

> Unless parties to a lawful contract specify a different rate of interest, the legal rate of interest for the loan or forbearance of any money, goods, or chose in action shall be 10% per annum.

¶ 28 The December 8, 1992 agreement stated that payment of the original loan and all other advanced monies would be "due on the date the Property is sold." Peterson claims this "extension of the date by which final payment of the Note was required was never intended and cannot reasonably be construed as an elimination of the ongoing

accrual of interest." Again, we disagree. This agreement plainly modified the original due date of the Peterson Note from March 1992 until the date the Property was sold. The December 1992 agreement, however, is silent as to whether default interest on the Peterson Note accruing from March 1992 to December 1992 is waived, just as it is silent on whether default interest would continue to accrue until payment. Accordingly, the language of the December 1992 agreement must be read as extending the original due date of the Peterson Note, thus terminating Harrington's ongoing default, but it does not forgive default interest already accrued on the Peterson Note.

¶ 29 We conclude the terms of the 1991 Peterson Note, when read in conjunction with the December 1992 agreement, mandate that Peterson is due default interest on the original $95,000 Peterson Note at ten percent, but only during the period of actual default that existed between when the Peterson Note was first due and when the parties agreed to a revised due date, i.e., from March 1992 to December 8, 1992.

III.   Attorney Fees

■ ¶ 30 Finally, we note that both parties seek attorney fees related to this appeal. We conclude the issue of attorney fees is not properly before us. In this case, the trial court specifically reserved the issue of attorney fees. The Judgment and Order of Dismissal below stated: "Pursuant to the stipulation of the parties, issues relating to claims for attorneys' fees are reserved." Thus, it would be premature for us to make an award of attorney fees to either party. The trial court on remand should consider whether attorney fees are due and, if so, award attorney fees incurred, including those on appeal.

## CONCLUSION

¶ 31 We conclude that the June 1991 Peterson Trust Deed grants Peterson a security interest in the Property covering her advance of construction funds throughout 1993. Accordingly, we reverse the trial court's determination that $65,177.63 in advances made in 1993 were not secured by the Peterson Trust Deed. Furthermore, we conclude that under the original Peterson Note, as read in conjunction with the December 1992 agreement, interest at the rate of ten percent is due Peterson from March 1992, the original date of default, until December 1992, the date the parties agreed to extend the due date until the sale of the Property. Finally, we remand with instructions to the trial court to consider the issue of an award of attorney fees both at trial and on appeal. We therefore reverse and remand for proceedings consistent with our opinion.

¶ 32 WE CONCUR:  RUSSELL W. BENCH, Judge, and GREGORY K. ORME, Judge, concur.